# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs June 4, 2013

## STATE OF TENNESSEE v. STEPHEN BRIAN WILCOX

**Appeal from the Circuit Court for Madison County**
**No. 11-356     David G. Hayes, Special Judge**

**No. W2012-01592-CCA-R3-CD  - Filed August 9, 2013**

Stephen Brian Wilcox ("the Defendant") was convicted by a jury of attempted aggravated sexual battery. Following a sentencing hearing, the trial court sentenced the Defendant to six years' incarceration. In this appeal, the Defendant contends that the evidence is not sufficient to support his conviction and that the trial court erred in sentencing him. The Defendant also argues that the trial court erred in excluding testimony related to alleged sexual accusations made by the victim against others, in permitting the victim to be brought into the courtroom to be identified, and in permitting the State to continue its direct examination of the victim's mother after it passed the witness. After a thorough review of the record and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Daniel P. Bryant, Clarksville, Tennessee, for the appellant, Brian Stephen Wilcox.

Robert E. Cooper, Jr., Attorney General & Reporter; Clarence E. Lutz, Assistant Attorney General; James G. Woodall, District Attorney General; and James W. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

A Madison County Grand Jury indicted the Defendant on one count of attempted aggravated rape of a child and one count of aggravated sexual battery. Those charges arose out of an alleged incident which occurred on February 11, 2011, involving a three-year old child ("the victim").

Prior to the jury trial, a hearing was held on the State's motion in limine to exclude statements the victim allegedly made to her mother's sister ("Aunt") regarding sexual accusations against the victim's father and the victim's brother. According to the State, defense counsel turned over to the State a letter written by Aunt to defense counsel in which she apparently stated that the victim "indicated to [her] that on several occasions her father and her brother had touched her inappropriately on her privates and hurt her."[1] According to the State, Aunt claimed in her letter that when she told the victim's mother ("Mother") about the victim's statements, Mother "made threats against [Aunt] and her children." The defense argued that Aunt's testimony in this regard was critical to attacking Mother's credibility, which was their primary defense. The trial court granted the State's motion, ultimately concluding that the victim's alleged statements recounted by Aunt were not relevant and were "outside the scope of what's material to the issues that will be before the [c]ourt." The trial court also noted that the statements "for impeachment purposes" were not relevant "to the defense . . . other than to inject matters that might be totally inappropriate for the jury to consider."

Thereafter, the case proceeded to a jury trial on February 15-16, 2012, only on the aggravated sexual battery charge. It is not evident from the record on appeal at what point the State determined not to pursue the attempted aggravated rape of a child charge.

Mother testified that, in February 2011, she lived at Lincoln Courts in a two-bedroom duplex apartment located in Jackson, Madison County, Tennessee, with her two children: her son and the victim. The father of her children ("Father"), whom she was dating at the time, stayed at the residence three to four nights a week. At the time of the incident in this case, the victim was three years old and her brother ("Brother") was four years old. Mother stated that the Defendant was her uncle.

---

[1] The record before us does not include the letter prepared by Aunt. It appears, however, that the trial court was provided with a copy of the letter. According to the State's motion in limine which was included in the record on appeal, a copy of the letter was attached to the motion when it was filed.

Prior to the weekend of February 11, 2011, the Defendant's sister called Mother and asked if the Defendant could stay with Mother for the weekend of February 11, 2011, because she and the Defendant were "going to be moving back to Nashville and she would be staying with . . . her boyfriend . . . and [the Defendant] didn't really have nowhere[] [sic] to stay." Mother told the Defendant's sister that he could stay with her. The Defendant and one of his sons ("Son") arrived on February 11, 2011, to stay for the weekend. Mother explained to the Defendant that he and Son would sleep in the living room, which was downstairs, on the lounge chair and the couch and that she, Father, and their two children would sleep in her bedroom upstairs. She stated that the Defendant understood those sleeping arrangements. Mother described that in her bedroom there was a queen-sized bed and a "toddler's bed." Her two children slept in her bedroom at that time because the second bedroom was used more like a playroom.

Mother testified that she also had three additional friends over to her apartment that evening. According to her, the adults had been drinking beer. After the three friends left, Father and the Defendant wanted more beer so she and Father left to go to the convenience store. Before Mother and Father left, Mother "tucked" the victim into Mother's bed upstairs. Mother stated that the victim "still had her clothes on from the day," and Mother did not change her into pajamas because "she had just fell [sic] asleep, so [Mother was] just going to leave her sleeping." Mother also confirmed that the victim was wearing panties.

When Mother and Father returned from the store, both Son and Brother said "something" to her. She then "ran upstairs and opened [her] bedroom door and seen [sic] [the victim] on top of [the Defendant] with his hands on top of her legs. And [the victim] was straddled over him" facing him. The Defendant was "laying on his back" with both of his hands "on her upper thigh[s]." The victim only had on a T-shirt at that time and "her private area – specifically her genitals [were] exposed[.]" The Defendant "had no clothes on at all." She stated that the victim's genitals were touching the Defendant's body. Mother then "grabbed" the victim off of the Defendant and went to the bathroom, which also was upstairs. Father then went into the bedroom. Mother heard Father and the Defendant fighting. Specifically, she heard "them tumbling around" and "things knocking around." After the fight, Mother heard the Defendant "hollering for his son" and stated that they left the apartment before the police arrived.

Inside the bathroom, Mother asked the victim what had happened, and the victim told her. Mother then called 911. Mother described that the 911 operator had difficulty understanding her because she was "hysterical," so she ultimately gave the phone to Father to complete the call with the operator. After she gave the phone to Father, she believed that she left the bathroom and went downstairs.

Mother testified that when she left the bathroom, she saw blood "right beside the bed in the pathway." She did not see any injuries or blood on Father. After the incident, Mother also observed the victim's panties on Mother's bed and agreed that they were "soiled[.]" She stated that the victim was in the process of being potty trained at that time and "had difficulty wiping herself." Thus, she agreed that it was possible that the victim went to bed with soiled panties on.

The police arrived shortly after Mother called 911. She did not go back upstairs before the police arrived. Mother took the victim to the hospital that night, but Father did not accompany her. The victim later went to see Dr. Lisa Piercey.

The State then passed the witness. Before cross-examination, the trial court adjourned for lunch because defense counsel stated that he had numerous questions to ask Mother. After the recess, the State told the court that it thought of some additional questions and requested the court's permission to allow the State to ask a few additional questions. Defense counsel objected to any renewed direct examination of Mother. The trial court noted that it was within the discretion of the court to make that determination and that it would permit the State to renew its direct examination of Mother. The State also notified the court that it would be asking Mother to identify the victim in the presence of the jury so it would need the victim to be brought into the courtroom. The Defendant did not object to this.

The State resumed its direct examination of Mother, and the victim was brought into the courtroom for Mother to identify. Mother identified the victim as her daughter and the person about whom she had testified. Mother next identified a photograph of the victim, and it was admitted as an exhibit. Lastly, Mother identified the Defendant in court as her uncle and the perpetrator.

On cross-examination, Mother stated that Father was no longer her boyfriend at the time of trial. She denied that at the time of the incident she had been planning to leave Father, that she told the Defendant this, and that she was "asking his help[.]" She also denied that Father had never liked the Defendant.

Mother acknowledged that she and her two children lived with the Defendant and his wife when the victim was born and for a little while after that. She agreed that the Defendant and the victim sometimes would be in the same bedroom, but she denied that they also occasionally even would be in the same bed. After living with the Defendant, Mother and her two children also lived with the Defendant's mother for a few months.

Mother could not recall at what time she and Father left to go to the convenience store on the night of the incident, but she stated that it was dark outside and late. She testified that

the store was approximately ten or fifteen minutes away from her apartment and that Father drove them. She told the Defendant that she and Father were going to the store and gave him an estimate of how long they would be gone. She believed that they were gone for approximately thirty minutes – about five minutes longer than she had estimated.

Mother stated that Father drank "some beers" and "took a few shots" that night. Mother also "took a few [shots]." She was not sure exactly how much the Defendant drank before she and Father went to the store. She believed, however, that he had "a few beers." She agreed that she arranged the Defendant to be a babysitter while she and Father went to the store even though the Defendant had been drinking. She also acknowledged that the three friends she had over and Father smoked marijuana that evening at her apartment.

Mother testified that the toddler's bed in her bedroom was the victim's bed. Typically, one child slept in the toddler's bed, and the second child slept in her bed even when Father stayed the night. When the victim slept in the toddler's bed, she had crawled up into Mother's bed during the night on previous occasions. She denied that around the time that the incident occurred the victim ever took her own pants off in their apartment. Mother stated that the victim could not even dress and undress herself at that time. Mother agreed that the victim sometimes just wore her panties and a shirt to bed. Mother could not recall whether on the night of the incident the victim was just wearing her panties and a shirt when Mother put her to bed. She knew, however, that she "was not naked from the waist down" when she laid her in the bed.

When she and Father left for the store, Brother and Son were playing the PlayStation in the living room. She did not recall whether they were still playing it when she and Father returned from the store. She only remembered "them running up to [her and Father] as soon as [they] had walked through the door." When she went upstairs, Brother and Son stayed downstairs. Mother stated that her bedroom door was barely cracked open before she went into the bedroom. She added that the door did not have a lock on it.

Mother stated that her bed was positioned against two walls and that the Defendant was lying on his back almost in the middle of the bed when she walked in. The lights were off in the bedroom, and it was dark, but "there was a lot of light around" the apartment so she could still see into the room. Father remained downstairs talking to Brother and Son when she went upstairs. He came upstairs "a few seconds" later and told her to call the police. She stated that she "had already dialed it" when he told her to do so. She did not know whether the Defendant put his clothes on before he left. However, when she came out of the bathroom, the Defendant's clothing was gone, but she believed that there was a T-shirt left behind. Neither she nor Father had a firearm in the house.

Mother agreed that she did not do anything to prevent the Defendant from leaving her apartment. She denied that the Defendant "wash[ed] himself" in the bathroom before leaving because she had been in the bathroom with the victim. Lastly, Mother acknowledged that she previously had accused other people of improper sexual acts, stating, "Yes, sir. My grandfather with myself."

On re-direct examination, Mother stated that she believed she was approximately nine years old when her grandfather began sexually abusing her. She denied that she had "any idea that [the Defendant] was capable of such an act until [she] walked in that bedroom door and saw what [she] saw." She also would not have "left them with him if [she] thought there was a risk," and she agreed that it was "a shock[.]"

Dr. Lisa Piercey, a pediatrician, testified at the trial as an expert in child sexual abuse. She stated that she had the opportunity to examine the victim on February 16, 2011. She did not interview the three-year-old victim at the time because medical protocol provided that you only take medical history starting at age four. Dr. Piercey instead spoke to Mother.

Dr. Piercey was told that the victim was brought to her for an examination because there was a concern of suspected sexual abuse. Dr. Piercey then performed a "head-to-toe" physical exam of the victim. The victim's exam was normal. Dr. Piercey stated, however, that what was described to her would not be expected to cause any injury. Dr. Piercey also did not find any indication of penetration. However, based on what Mother told her, "that was to be expected." A rape kit was not performed on the victim. Dr. Piercey stated that a rape kit is not performed if "there's no allegation of penetration or exchange of bodily fluids" or "if the alleged penetration[] . . . had been over seventy-two hours" ago.

On cross-examination, Dr. Piercey testified that in cases where the allegation is touching, there is occasionally DNA evidence but typically not injury. Also, occasionally there is irritation and sometimes there is redness or "those types of things[.]" Additionally, Dr. Piercey testified that bruising is possible with fondling although it is not typical. She added that sometimes very young children show bruising less because their skin is more elastic. She does not have to perform a rape kit to determine whether there is penetration – that she can make that determination based on an examination as well. Lastly, Dr. Piercey testified that the victim's examination at the emergency room revealed no physical findings.

Lanonda Jernigan, the director of Jackson's Central Dispatch Police and Fire 911 PSAP, testified that the 911 call from Mother came in to the 911 dispatch center at 11:37 p.m. and that the call lasted approximately four minutes. Jernigan also had the records related to the police department's response to that call. According to those records, an officer was dispatched at 11:38:01 p.m. to Lincoln Courts, and Officer Bray was the first to

arrive to Lincoln Courts at 11:40:45 pm. A few seconds later, Officer Robert Grove arrived. The 911 call was admitted as an exhibit, and it was played to the jury.

On cross-examination, Jernigan acknowledged that there were two different voices on the 911 call. She stated that the "man at the end said that someone was naked in the bed with [the victim]" and that "they'd been gone for over an hour[.]" The man also stated that they would take the victim to the hospital instead of waiting for the police to arrive at their apartment.

Officer Robert Groves of the Jackson Police Department ("JPD") testified that he received a call on the night of February 11, 2011, to respond to Mother's apartment. Although he was the first officer to arrive at her apartment, approximately three additional officers arrived shortly after he did. When he arrived at Mother's apartment, the door was "cracked" open, and he could hear a woman inside crying and screaming. He opened the door to the apartment and saw Mother in the corner of the living room downstairs, "crying hysterically." She was in a "state of hysterics" and was screaming and crying, and she kept saying, "That's my baby," and, "He touched my baby." Officer Groves testified that she kept screaming those two phrases "over and over" for approximately five to ten minutes. The officers took turns trying to calm Mother down. He denied ever seeing Mother go upstairs.

After Officer Groves' initial investigation, he called for investigators to respond to the scene. Three or four investigators arrived approximately ten minutes after Officer Groves' arrival, including Investigators Dwayne McCain and Susan Cole.

Officer Groves also came into contact with Father at the scene. Two young children were in the apartment as well – one male and one female. The Defendant, however, was not at the apartment when Officer Groves arrived.

Officer Groves spoke to Father downstairs and asked him where the incident had taken place. Father told him that it occurred in their bed upstairs, and he pointed Officer Groves in the direction of the bedroom. Father did not accompany Officer Groves into the bedroom, and Father never went into the bedroom while Officer Groves was at the apartment. Neither did Mother. Officer Groves stated that the covers and the sheets on the bed "kind of had been discarded to one side of the bed, almost pushed off," and there was one pair of little girl's panties on the bed. The panties were towards the foot of the bed. He did not see any blood or any sign of a physical struggle.

On cross-examination, Officer Groves could not recall specifically what the victim was wearing when he saw her. He recalled, however, that she was wearing a top and a

bottom and that she was barefoot. He did not know if she had panties on at the time. He could not recall whether the light was on in Mother's bedroom when he went upstairs.

On re-direct examination, Officer Groves stated that they sent both children to the hospital along with both parents. He stated that the officers "almost called an ambulance for [Mother] because . . . [they] thought she was going to pass out." He did not believe that she was acting and stated that she was "authentic."

Investigator Dwayne McClain of the JPD testified that on the night of February 11, 2011, he also was dispatched to Mother's apartment. Officer Insell accompanied him to the scene. Several officers already were on the scene when they arrived. Investigator McClain initially went into the kitchen where other officers were attempting to talk to Mother who was "very hysterical."

Investigator McClain went upstairs to the bedroom where he was told the incident occurred. Investigator McClain observed a "small pair of child's undergarments" lying on the corner of the bed. He also observed "blood droppings" on the floor in the bedroom and on the comforter and sheet. He instructed Officer Insell to take photographs of evidence inside the bedroom. The comforter, sheet, and panties were collected and sent to the TBI for testing. A cell phone found on top of the dresser in Mother's bedroom and a TomTom navigation device found in the kitchen, both of which allegedly belonged to the Defendant, also were collected.

On cross-examination, Investigator McClain acknowledged that there only was approximately "a foot or so gap" between the foot of the adult bed and the child's bed. He confirmed that the panties found on the adult bed were "against the wall" and "close to the child's bed[.]"

Investigator Susan Cole of the JPD testified that she interviewed the Defendant and collected buccal swabs from him. At the time of the interview, the Defendant "was being held for investigation of rape of a child." She read the Defendant his Miranda warnings prior to taking a statement from him. The Defendant signed a "Rights Waiver Form" which she also read to him. Investigator Cole took the Defendant's statement on February 12, 2011, at 5:10 p.m., and he stated the following:

> Last night I was staying the night with [Mother] and [Father]. I went to get in bed at about eleven o'clock p.m. I fell asleep and [Mother] and [Father] left about five minutes before I went to bed.

[The victim] was in the bed. I laid down in the bed. I don't know if [the victim] had on any clothes when I laid down with her. I think she was on top of the covers. I had a lot to drink and don't remember.

[Mother] and [Father] woke me up about twenty minutes later and said something about [the victim].

[Father] asked me to leave the house and as I was going to leave, I wasn't – I was (sic) in bed naked with [the victim] at the time – at any time. I don't know why I'm going – what is going on in [Mother's] head. I know I didn't touch [the victim].

I heard [Brother] is the one that told him I was naked with [the victim], not my son[.] . . .

I don't know why she is making these allegations.

On cross-examination, Investigator Cole confirmed that she actually wrote out the Defendant's statement based on what the Defendant said to her during the interview. She also agreed that the Defendant asked her to modify a portion of the statement which now "[g]rammatically [] doesn't quite make sense what it says." She stated that the part "I wasn't – I was (sic) in bed naked with [the victim]" actually should read, "I wasn't in bed naked with [the victim]." She also agreed that the Defendant did not admit to anything "criminal" in the interview.

Special Agent Gregory Fort, with the Tennessee Bureau of Investigation ("TBI") serology and DNA unit, testified that he examined items collected in this case for biological fluids. He received buccal swabs from the Defendant, Father, Mother, and the victim; panties collected from a bed at Mother's apartment; and a fitted sheet and comforter collected from a bed at Mother's apartment.

Special Agent Fort was able to get a full DNA profile for each of the four individuals from the buccal swabs. The examination of the panties did not reveal the presence of semen. He examined nine areas of the fitted sheet. Two of those areas failed to reveal the presence of semen. Six of those areas did reveal the presence of semen. Special Agent Fort obtained a DNA profile for those six areas, and each contained a mixture of genetic material from Mother and Father. One of the nine areas examined revealed a different stain which the presumptive tests indicated the presence of blood. The DNA profile from the blood stain matched the Defendant's DNA profile. The comforter revealed the presence of semen. Special Agent Fort obtained a DNA profile which matched Father's.

On cross-examination, Special Agent Fort stated that he tested the items for semen, blood, and saliva. On re-direct examination, he recalled that there was "a fecal stain on [the victim's] panties" but stated that he did not test it because it is not part of the protocol to test that type of stain.

The State rested its proof, and the Defendant made a motion for a judgment of acquittal. The trial court denied that motion.

The Defendant chose to testify on his own behalf. He testified that he had four children, ranging from ages eight to twenty-two. He stated that he was the victim's great uncle and that she had been around him most of her life.

According to the Defendant, Mother and her two children lived with him and his wife at the time, Rosa, "on and off many times." The victim was born during one of the times that Mother was staying at his house. During the times that Mother and her children lived with the Defendant, he helped take care of the victim. Mother and her two children lived with him after the victim was born for "almost half of her life." The Defendant explained that while they lived with him, Mother would sleep in so Rosa "would bring [the victim] in and [the victim] would sleep right there in the bed with [him while] Rosa was on the computer." He stated that he had been in the same bed with the victim "[m]any times" while they lived with him.

The Defendant testified that on the night of the alleged incident, February 11, 2011, he and Son were at Mother's apartment to spend the weekend there. That evening, three other adults came to the apartment to visit. They were all drinking, and "there was drugs." The Defendant admitted to having "quite a bit" to drink, but he denied that he did any drugs that evening. He stopped drinking sometime around 10:30-11:00 p.m.

He next explained that Mother and Father left to go to the store to "get more – more supply of drugs, alcohol." The three visitors left the apartment sometime before Mother and Father went to the store. Mother and Father told him that they would not be gone long, but they did not give an exact time. When Mother and Father left, he was downstairs with Son, Brother, and the victim. The three of them went upstairs "for some reason," and he also went upstairs. They went back downstairs, but he remained upstairs. While upstairs, the Defendant explained:

> I sat in the bed. And when I was there, I don't know, I just passed out. And when I came to, it was . . . [Mother] and [Father] saying something, and [Father] asked me to leave.

He didn't, you know, as they stated was different with – [Father] told
me to leave. And as I was leaving I guess something was said. We ended up
in a scuffle. And I kept going. I got my son, the car –

Defense counsel interrupted the Defendant and asked him whether he had a chance "to clean [him]self up?" The Defendant responded, "Yes. I had a towel and I wiped myself. The towel was in the car when I was – when I turned myself in."

The Defendant denied that he was naked in Mother's bed. Instead, he stated, "At the very least I had my boxers and my underwear. I wear boxers and underwear at the same time. I don't wear them separate." He explained that "boxers" are his pajamas. The Defendant stated that he did not lie down on the couch downstairs because "[Son] and them went upstairs and everything. I didn't realize they were going back down. And I just passed out." Asked if he knew where the victim was during all this time, the Defendant responded, "Not specifically. I know she – from everything gathered that she was in the bed. That's all I know." He did not recall what the victim was wearing at any point that night.

The Defendant turned himself in to the police the next day when his family members told him that the police were looking for him. Before turning himself in, he dropped Son off with a family member, and that family member drove him to the police department. The Defendant denied doing anything inappropriate to the victim. He denied that he touched her in any way, stating, "I would never harm any one of them kids." He further denied touching her on any "private part," and he denied that she touched him on any "private part."

On cross-examination, the Defendant agreed that Mother and Father gave him permission to spend the night at Mother's apartment. He also had stayed the night with Mother and her family on previous occasions. The Defendant denied that Mother or Father discussed with him the sleeping arrangements. Instead, he stated that "[l]ogically [he] would have slept downstairs" and that "[i]t was just assumed" that he would sleep downstairs with Son on the couch.

The Defendant acknowledged that he was "asleep on the bed, passed out drunk, in the bed with [the victim]." He stated that he received an injury from Father when they "scuffled" and that he was bleeding. He denied that his blood went "all over the place[.]" The Defendant recalled giving a statement to Investigator Cole. He denied, however, that at the time of the statement he knew that his blood was going to be found in that bed so he "had to admit that [he] was in the bed with [the victim]."

The Defendant denied that at the time he was awakened from the bed, Mother was "hysterical[.]" He stated that she was not "hysterical on – right at the beginning." Instead,

-11-

she became hysterical "[a]fterwards." In terms of why Mother was hysterical, the Defendant stated, "My explanation is obviously it was – something was misconstrued or she misseen [sic] it or whatever. But you can try and turn things around all you want. I didn't touch [the victim.]" The Defendant also stated that "[the victim] was never straddled on top of [his] body." The Defendant did not know if the victim was still in the bedroom when he was awakened. The Defendant did not recall seeing the victim being held by Mother after he "woke up and . . . [Father] told [him] to leave."

Son testified that he was ten years old at the time of trial and that the Defendant was his father.[2] He recalled going to Mother's apartment on February 11, 2011. When he and the Defendant got to Mother's apartment, he played the PlayStation with Brother and the victim. The adults were "drinking," and they also "put on music and start[ed] running around and stuff." Son agreed that the Defendant was one of the people drinking.

After Mother and Father left, the victim went upstairs while he and Brother "were playing in the middle of a game," and he thought that she "was going to her room." Son explained that the victim then came back downstairs, and he had her play with "games and stuff." According to him, the victim went upstairs again and laid down at the end of the bed. He described the victim's wearing "a big old white shirt" that "was way too big for her."

Son knew that the victim laid down at the end of the bed because he went up there to check on her when he had to use the bathroom. He stated that the victim then fell asleep. He added,

And [the Defendant] was going – walking back and forth. When I went back downstairs [the Defendant] was walking back and forth. And I don't know what he was doing.

He went upstairs. He laid down. Then I heard – After a little bit later I heard screamings [sic], yelling. [The victim] came down the steps crying.

When she got downstairs, she said, "I want my mommy." Initially, Son stated that the victim came downstairs "[a]bout a few seconds" after the Defendant went upstairs. He then stated, however, that he believed she came downstairs "like ten minutes or so" after the Defendant went upstairs.

Son then went upstairs and got her a ball. They started playing with it because he thought it would calm her down. He did not look in Mother's bedroom at that time to see if

_____

[2] The trial court, outside the presence of the jury, questioned Son and found him competent to testify.

the Defendant still was in there.  He stated that the victim would not calm down.  Brother then went upstairs "and said something about [the Defendant], so [he] went upstairs and looked at him.  He was in his boxers" and did not have a blanket over him.  Son described that the Defendant always wore "underwear under his boxers."  Son went back downstairs and said, "No, nothing's wrong with him." He and Brother began playing another game.

Son testified that when Mother and Father returned from the store, the victim was in the living room sitting down.  When they came inside the apartment, the victim went over to them and started talking.  He heard the victim say, "Uncle Steve."  Mother and Father then "went and started going up the stairs."  Son went upstairs sometime after they did and saw Father "punching the living crap out of [the Defendant]."  Son "tried to stop" Father and "actually tried to hit him."  Father then "all of a sudden . . . went over there, picked [the Defendant] up, and he just threw him.  He was cussing while beating him up, too."  Father then walked out of the room and went down the stairs.  Son tried to help the Defendant get up.  The Defendant then went downstairs, and Son followed a couple minutes later.  He saw Father "just walking back and forth."  Initially, he could not find the Defendant, but he eventually saw him in the middle of the kitchen. The Defendant told him to get his belongings because they were going to leave.  They left the apartment, got into their car, and drove around the building.  They slept in their car that night.

On cross-examination, Son stated that when Mother and Father returned, the victim still was wearing a "big white T-shirt."  The T-shirt covered "the bottom part[.]"  He stated that you could almost see through the shirt and believed that "[n]othing was under it" because "there would be like a dark color."  He agreed, however, that if she was wearing light-colored panties that he might not be able to see them.  He denied approaching Mother and Father when they returned and telling them, "Don't be mad at [the Defendant] because he's upstairs with [the victim] and he's naked."  He also denied saying anything similar to that to Mother or Father.

When Son found the Defendant after the incident, the Defendant whispered to him, "Get your stuff and come on."  He denied that the Defendant was upset at that time.  He did not know why Father "started beating on [the Defendant]."  He did hear Mother say, however, "'Call the cops,' and stuff."

The defense then rested its proof.  The State called Mother as a rebuttal witness.  She testified that when she and Father returned from the store, Son said to her, "Please don't be mad.  My daddy is upstairs naked."  She then ran upstairs.  When they returned from the store, the victim was upstairs too because that is where she found her.

-13-

The State then called Father as another rebuttal witness. He stated that on the night of February 11, 2011, he and Mother discussed with the Defendant that the Defendant and Son would sleep on the couch downstairs. After Father returned from the store with Mother, they walked into the apartment and Son "met [them] like close to the stairs." Son stated, "Don't be mad. . . . Don't be mad." Father asked, "What? What you mean, I'll be mad?" Son replied, "My dad – my dad upstairs naked." Father then testified, "And we were like, 'What? What you mean, upstairs naked.'" Son stated again, "He's upstairs naked – naked. Please don't be mad. Don't be mad at him." Father asked him where the victim was, and Son said that "[s]he [is] upstairs naked, too."

Father stated that Mother "hurried up and ran on up the stairs." He then heard her "crying and bawling." He went upstairs after that. By the time that he got to the bedroom, Mother already had grabbed the victim, and Mother was in the bathroom "crying and stuff." Father described that he saw the Defendant "laying in [their] bed." He agreed that the "bottom half of [the Defendant's] body" was exposed, stating, "Yeah. His penis was out." Father was "kind of hysterical" and asked the Defendant, "What's – what's going on . . . What [are] you doing?" The Defendant responded, "It ain't – it ain't what it seem, it ain't what it seem." Father replied, "What you mean, it ain't what it seem? You in – you in my bed naked, you know. What – what's going on?" The Defendant then "kindly got out of the bed" and started "putting his pants on and stuff." Father then got into a physical altercation with the Defendant. He acknowledged that he hit the Defendant and that the Defendant was bleeding. Lastly, Father denied that when he and Mother returned from the store that the victim was downstairs.

On cross-examination, Father agreed that he had been drinking on the night of the incident. He also acknowledged smoking marijuana at some point that evening. Father recalled making a statement to police the day after the incident. He denied that he told the police at that time that the victim was completely naked. Father also recalled making another statement to police in January 2012. In that statement, he recalled telling the police that he did not remember all of the details of what happened that night. He agreed that he told the police that he was intoxicated on the night of the incident. Father could not recall what he told the police the Defendant was wearing when he saw him in the bed. He knew, however, that the Defendant's "pants was [sic] off for sure" and that "his penis was out." He could not recall whether he told the police that the Defendant was completely naked. He confirmed that he never saw the victim on top of the Defendant. He stated that Mother went upstairs first and that he remained downstairs. After Mother went upstairs, he further talked to Son for "like a split second," asked him "what's going on," and then went upstairs as well. The victim did not have any bottoms on when he saw her after the incident, but she had on a t-shirt.

-14-

The state rested its rebuttal proof. The jury then deliberated and found the Defendant guilty of the lesser-included offense of attempted aggravated sexual battery.

At the subsequent sentencing hearing, the presentence report was admitted as an exhibit without objection. The State called no witnesses at the sentencing hearing. The defense called the Defendant's twenty-one year old son, Stephen, to testify on the Defendant's behalf. Stephen testified that the Defendant was his father and that the Defendant also had three other children, all who were younger than he. He stated that the Defendant was "a really good father" who had "helped [him] a lot throughout life." Stephen testified that the Defendant also had been there for his other three children since they were born. Stephen's mother had passed away, but the mother of the Defendant's other three children was still living. Stephen also testified that the Defendant had helped out the mother of his siblings; that when the Defendant was working, he gave "whatever money the kids need"; that he helped fix their vehicles; and that he had "always been there for the family[.]" Lastly, Stephen stated that his whole family had been behind the Defendant since this started.

On cross-examination, Stephen acknowledged that the Defendant had never been married. He stated, however, that "both relationships that he's been in . . . have lasted – the two have lasted my whole life together."

The Defendant did not testify at the sentencing hearing. He, however, did give a statement of allocution:

> I just want to say I'm sorry this whole mess is going on. It's not true, I would never harm my niece. I would never. I just wanted to let that be known for the record. That's really all that I really wanted to say.

At the conclusion of the hearing, the trial court found that the Defendant was a Range I offender. The trial court also found the following enhancement factors applicable: "the Defendant has a previous history of criminal convictions or criminal behavior"; and "the Defendant abused a position of private trust that significantly facilitated the commission or the fulfillment of the offense." See Tenn. Code Ann. § 40-35-114 (1), (14) (Supp. 2007). The trial court noted that it considered alternative sentencing but determined that confinement in this case was necessary to avoid depreciating the seriousness of the offense. The trial court sentenced the Defendant to six years' incarceration as a Range I offender. The trial court also sentenced the Defendant, pursuant to Tennessee Code Annotated sections 39-13-524 and 40-39-201, to community supervision for life and ordered that he be placed on the sex offender registry.

The Defendant filed a motion for a new trial which the trial court denied. On appeal, the Defendant contends that the evidence is insufficient to support his conviction. He also contends that the trial court erred by (1) excluding Aunt's trial testimony related to sexual accusations the victim made against Father and Brother; (2) permitting the victim to be brought into the courtroom in front of the jury for Mother to identify; and (3) permitting the State to continue its direct examination of Mother after it passed the witness. Lastly, the Defendant contends that the trial court erred in sentencing him.

## Analysis

### Sufficiency of the Evidence

The Defendant first challenges the sufficiency of the evidence supporting his attempted aggravated sexual battery conviction. Our Rules of Appellate Procedure provide that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

The Defendant challenges the sufficiency of the evidence for his attempted aggravated sexual battery conviction. Aggravated sexual battery, as applicable here, is the "unlawful sexual contact with a victim by the defendant" when the victim "is less than thirteen (13) years of age." Id. § 39-13-504(a)(4) (2010). Unlawful sexual contact, in turn, is defined as including:

> the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]

Id. § 39-13-501(2010). To obtain a conviction for *attempted* aggravated sexual battery, as applicable here, the State must prove that the defendant acted with the intent to complete a course of action that would constitute aggravated sexual battery and that his conduct constituted a substantial step toward the commission of the offense. See Tenn. Code Ann. § 39-12-101(a)(3) (2010). The defendant's conduct does not constitute a "substantial step . . . unless [his] entire course of action is corroborative of the intent to commit the offense." Id. § 39-12-101(b).

The Defendant first contends that no proof was submitted that he had taken a substantial step toward the completion of aggravated sexual battery and that there was no testimony or other proof related to sexual arousal or gratification. We disagree. The proof, taken in a light most favorable to the State, established that the Defendant attempted to commit aggravated sexual battery. Although the Defendant was told that he was to sleep downstairs on the couch, Mother found him upstairs, in her bed, lying on his back with his genitals exposed. The three-year old victim was "straddled" over the Defendant, and his hands were "on her upper thigh[s]." Although the victim was wearing panties when Mother put her to bed, her panties had been removed. Moreover, her "genitals [were] touching [the Defendant's] body." This evidence established that the Defendant took a substantial step toward committing aggravated sexual battery. Moreover, given that the victim was nude from the waist down, "straddled" over the Defendant, who also was nude at least from the waist down, and his hands were "on her upper thigh[s]," the jury reasonably construed the Defendant's conduct as being for the purpose of sexual arousal or gratification.

The Defendant also contends that Mother's testimony was directly refuted by both the Defendant's and Son's testimony. As set forth above, this Court does not reassess witness credibility when reviewing the sufficiency of the evidence. See, e.g., Dellinger v. State, 279 S.W.3d 282, 292 (Tenn. 2009) ("It is well established that appellate courts do not reassess credibility determinations."). It is the jury's duty to determine whom to believe when presented with conflicting accounts. In this case, the jury chose to accredit Mother's testimony, and it rejected both the Defendant's and Son's testimony. The jury acted within its prerogative, and the evidence is sufficient to support the jury's verdict. Accordingly, the Defendant is entitled to no relief on this issue.

### Excluded Testimony

The Defendant next contends that the trial court erred in excluding Aunt's testimony related to the victim's making allegations of sexual abuse allegedly perpetrated by Father and Brother on the basis that it was not relevant. The Defendant argues that the testimony of Aunt was relevant to show that Mother and Father were aware of the allegations and that, thus, they were given "motive to fabricate a third party scapegoat, [the] Defendant." The Defendant further argues that the State caused the issue of "motive to fabricate" to be a fact of consequence by arguing to the jury in closing that the Defendant failed to provide a motive for the State's witnesses to lie.

Here, the record before us does not include the letter written by Aunt which apparently outlined her proposed testimony in this regard. Nor did the Defendant proffer her testimony in an offer of proof at the hearing on the State's motion in limine to exclude her testimony. See Tenn. R. Evid. 103(a)(2) (error may not be predicated on exclusion of evidence if no offer of proof is contained in the record). Thus, the Defendant is asking this Court to review an evidentiary ruling by the trial court without providing us the potential evidence which the trial court reviewed.

The Defendant must provide a record which conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue." State v. Ballard, 855 S.W.2d 557, 560–61 (Tenn. 1993). In such cases, we must presume that the trial court ruled correctly. State v. Ivy, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993); State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Thus, the record provided by the Defendant on this issue does not provide this Court with a sufficient basis for review. Consequently, he is not entitled to relief on this issue. See Tenn. R. Evid. 103(a)(2).

## Victim Identified to the Jury

The Defendant also argues that the trial court erred in permitting the State to bring the victim, who did not testify, into the courtroom in front of the jury for several moments to be identified by Mother. The Defendant claims that "this act was an obvious stunt by the State to engender the sympathies of the jurors." The Defendant did not object at trial to the victim being brought into the courtroom to be identified by Mother. "The failure to make a contemporaneous objection constitutes waiver of the issue on appeal." State v. Gilley, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008); see also Tenn. R. Evid. 103(a)(1). Accordingly, the Defendant has waived this issue for appellate review.

## Continued Direct Examination

The Defendant next contends that the trial court erred in permitting the State to continue its direct examination of Mother after it passed the witness. After the State announced that it passed the witness, the proceedings adjourned for a lunch break. Following the lunch break, the State sought the trial court's permission to renew its direct examination of Mother to ask a few additional questions, which the trial court permitted.

It is well-settled that "the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to review for abuse of discretion." State v. James, 315 S.W.3d 440, 460 (Tenn. 2010) (citations omitted). We will find an abuse of discretion "when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." Banks, 271 S.W.3d at 116 (citing Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)); see also State v. Looper, 118 S.W.3d 386, 422 (Tenn. Crim. App. Feb. 3, 2003). The Defendant has failed to demonstrate that the trial court abused its discretion in permitting the State to renew its direct examination of Mother. For these reasons, the Defendant is entitled to no relief on this issue.

## Sentencing

The Defendant also has challenged his sentence, specifically contending that the trial court should not have placed heavy emphasis on the Defendant's prior voluntary manslaughter conviction from 1984.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of

discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401 (2010), Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)

Prior to imposing a sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1), (3)(C) (2010). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in

determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2010).

Our Sentencing Act also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Additionally, a sentence including confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann.§ 40-35-103(1).

The Defendant was convicted of attempted aggravated sexual battery, a Class C felony.[3]  The Range I sentence for a Class C felony is three to six years. See Tenn. Code Ann. § 40-35-112(a)(3) (2010).  The trial court sentenced the Defendant to six years, which is within the authorized term for the respective class.

_____

[3] See Tenn. Code Ann. § 39-13-504(b), § 39-12-107(a) (2010).

-21-

The Defendant only challenges the trial court's "heavy emphasis" on his 1984 conviction for voluntary manslaughter in determining that the Defendant had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." Tenn. Code Ann. § 40-35-114(1) (2010). In support of this contention, the Defendant asserts that "an offense committed in a distant past should be deemphasized as an enhancer" and that an "offense committed while a minor, even where the juvenile is transferred to adult court, [as was the Defendant], is less heinous than the calculated knowing transgression of a much older offender." The Defendant, however, cited no case law in his brief in support of this argument.

In determining that the Defendant had a prior history of criminal convictions or criminal behavior, the trial court found that the Defendant had been convicted of the following offenses: voluntary manslaughter and theft of property $1,000-$10,000 in 1984; disorderly conduct in 2007; failure to appear in 2008; domestic violence in 2008; and a traffic violation in 2009. In finding this enhancement factor applicable, the trial court took into consideration all of the aforementioned convictions, except that it noted that the traffic offense was "fairly insignificant." With respect to considering the Defendant's 1984 felony convictions, our Sentencing Act does not limit the time for measuring a defendant's prior history of criminal behavior. See, e.g., Tenn. Code Ann. § 40-35-114(1); State v. Willie Danny Starnes, No. E2001-00083-CCA-MR3-CD, 2002 WL 127365, at *7 (Tenn. Crim. App. Feb. 1, 2002), perm. app. denied (July 22, 2002). Although this enhancement factor is limited to adult criminal convictions or criminal behavior, see, e.g., State v. Jackson, 60 S.W.3d 738, 742 (Tenn. 2001), the fact that the Defendant was a juvenile when he pleaded guilty to those charges is irrelevant because he was transferred from juvenile court to criminal court.[4] Moreover, a trial court's weighing of applicable enhancement factors is "left to the trial court's sound discretion" and, under the revised Sentencing Act, is not reviewable on appeal. See Carter, 254 S.W.3d at 345. Accordingly, this issue is without merit.

**CONCLUSION**

For the reasons set forth above, we affirm the judgment of the trial court.

_____
JEFFREY S. BIVINS, JUDGE

---

[4] Even if these two felony convictions instead were adjudications in juvenile court, the trial court, as it noted, still could have considered those in sentencing the Defendant pursuant to the following enhancement factor: "The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult[.]" Tenn. Code Ann. § 40-35-114(16).